| | |
|---|---|
| TONYA LIGHTNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| INLIVIAN, et al., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** comes before the Court on the following motions: a Motion for Partial Summary Judgment as to Liability by Plaintiff Tonya Lightner, (Doc. No. 89), and a Motion for Summary Judgment, filed by Defendants Inlivian, formally known as the Charlotte Housing Authority ("Inlivian"), Creating Opportunities for Resident Empowerment Programs, Inc. ("C.O.R.E."), and Monica Nathan ("Nathan"). (Doc. No. 111).

### I. BACKGROUND

#### A. Procedural Background

Plaintiff worked for Defendant Inlivian from 2005 until June 2021, when she resigned her employment. On December 8, 2023, Plaintiff filed this action against Defendants Inlivian and her former supervisor, Monica Nathan, pleading two causes of action: retaliatory discrimination and deprivation of equal protection, both under 42 U.S.C. § 1983. (Doc. No. 1). On November 21, 2024, Plaintiff filed an Amended Complaint, adding as a defendant the corporate entity C.O.R.E. Programs, Inc., and adding claims for constructive discharge, hostile work

1

environment, both also under 42 U.S.C. § 1983, and a claim for negligent supervision and retention. See (Doc. No. 49).

On December 2, 2024, Defendants filed a motion to dismiss Plaintiff's Amended Complaint. (Doc. No. 52). The Court granted the motion in part on February 21, 2025. (Doc. No. 86). The Order dismissed with prejudice Count Two of Plaintiff's Amended Complaint. Counts One, Three, and Four, and all claims for punitive damages, were also dismissed with prejudice as to Defendants Inlivian, C.O.R.E., and Defendant Nathan in her official capacity. Thus, the remaining pending claims are claims for Retaliation (Claim One); Constructive Discharge (Claim Three); and Hostile Work Environment (Claim Four) against Defendant Nathan in her individual capacity; and a claim for negligent supervision and retention (Count Five) against Defendants Inlivian and C.O.R.E.

On March 14, 2025, Plaintiff filed a motion for summary judgment as to liability. (Doc. No. 89). Defendants filed a response in opposition. (Doc. No. 101). On April 30, 2025, Defendants filed its own summary judgment motion. (Doc. No. 111). Plaintiff filed a response in opposition, (Doc. No. 114), and the Court held a hearing on the summary judgment motions as well as other pending discovery motions on June 18, 2025. At the hearing, the Court granted Plaintiff's request to submit additional evidence, and the parties were given the opportunity to file supplemental briefs. The parties have briefed the additional evidence, and this matter is ripe for disposition. (Doc. Nos. 122, 127).

B. **Factual Background and Plaintiff's Evidence**

Plaintiff worked for Defendant Inlivian from 2005 until June 2021. Plaintiff's last position at Inlivian was Homeownership Program Coordinator, which she began in January 2020. (Doc. No. 92-54, Lightner Dep. Tr. p. 49). Plaintiff's duties included keeping the

Homeownership Program in compliance with requisite laws and she was deemed the subject matter expert for the Homeownership Program. (Doc. No. 92-43; Doc. No. 92-51, Evans Dep. Tr. p. 13). The homeownership program is a federally funded program administered by the City of Charlotte to assist residents who are historically ineligible to receive a home loan due to having a lower credit score and/or experiencing financial challenges, which disproportionately impacts minority and elderly residents. The program was initially managed by the Housing Choice Voucher (HCV) department but was later transferred to C.O.R.E. (Doc. No. 92-51, Evans Dep. Tr. p. 44) (Doc. No. 92-56, Nathan Dep. Tr. pp. 42–44).

Defendant Nathan served as Senior Vice President of C.O.R.E. and at all relevant times was Plaintiff's direct supervisor. (Doc. No. 92.54, Lightner Dep. Tr. p. 20). Plaintiff asserts that, in early 2020, she began to observe and was instructed to engage in practices that she believed violated the Department of Housing and Neighborhood Services ("HUD") regulations and Fair Housing Act ("FHA") policies. (Doc. No. 92-54, Lightner Dep. Tr. pp. 90–93). Plaintiff contends that Defendant Nathan instructed Plaintiff, in violation of HUD regulations and FHA policies, to do the following: (1) not maintain a central waitlist; (2) not stamp housing applications with the date and time they were received; (3) not properly store housing applications in a locked secure filing cabinet; (4) improperly select program participants; (5) discriminate against elderly and disabled applicants; (6) restrict participants' choice of lenders, realtors, and properties; and (7) mismanage funds. (Doc. No. 114 p. 5). Plaintiff reported her concerns to Defendant Nathan and informed Nathan that her actions were discriminatory. (Doc. No. 92-54, Lightner Dep. Tr. pp. 154–61). Plaintiff also maintains that, in later 2020 and early 2021, she reported her concerns to Shonte Hoover and Timica Melvin, who were managers at C.O.R.E. (Doc. No. 49 at ¶¶ 35–50; Doc. No. 92-54, Lightner Dep. Tr. pp. 87–88).

Plaintiff asserts that she continued to struggle with advocating for program participants while complying with Defendant Nathan's instructions in fear of losing her job. Plaintiff contends that when she performed her duties in compliance with HUD regulations and FHA policies, Defendant Nathan retaliated against Plaintiff by, among other things, not showing up for her monthly meetings, refusing to assist Plaintiff in her job duties, preventing Plaintiff from completing certain work tasks, and ultimately issuing her an informal warning on May 12, 2021. (Doc. No. 92-32–92-34). On one occasion, Nathan told Plaintiff that "[t]his is [Nathan's] program, and [Plaintiff] had to do what she said to do… And if HCV wanted to run the program, then they would have it… They do not… So, you will do what I say do." (Doc. No. 92-54, Lightner Dep. Tr. p. 156). Plaintiff asserts that she interpreted this statement as a threat to her job and right to free speech.

According to Plaintiff, as a result of the hostile work environment, she applied for FMLA in May of 2021 due to mental health issues, including anxiety and panic attacks. (Doc. No. 92-54 Lightner Dep. Tr. pp. 67–70). She further asserts that the ongoing hostility and retaliation created a hostile work environment that forced her to resign. On June 8, 2021, Mrs. Lightner submitted her resignation letter, effective July 30, 2021. Plaintiff asserts that she resigned due to Defendant Nathan's refusal to follow regulations and governance of C.O.R.E.'s Homeownership Program. (Doc. No. 92-52, Lightner Dep. Tr. p. 22). An external investigation into certain management practices by Defendant Nathan ultimately resulted in the termination of her employment. (Doc. No. 92-51, Evans Dep. Tr. pp. 135–39).

## II. STANDARD OF REVIEW

As noted, the parties have filed cross motions for summary judgment. Plaintiff seeks summary judgment on liability only. Summary judgment shall be granted "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a

5

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

III.   DISCUSSION

**A. Plaintiff's Evidence Submitted after the Court's Summary Judgment Hearing**

The Court first addresses evidence submitted following the Court's summary judgment hearing. On June 27, 2025, as ordered by the Court, Defendants filed under seal the "HCI Report, April 2023" ("HCI Report"). (Doc. No. 121). On March 30, 2023, Inlivian management requested that HCI Advisory Group, LLC ("HCI") investigate an issue raised by three employees pertaining to allegations of nepotism, poor management, and unprofessional behavior in the workplace, including by Defendant Nathan. The HCI report addresses conduct by Defendant Nathan that led to her termination from her position. At the conclusion of the summary judgment hearing, the Court ordered Defendant to file the HCI Report under seal for in camera review. The Court indicated that it would evaluate the evidence to determine whether additional discovery or proceedings are necessary.

Defendant has now filed the HCI Report under seal, and the Court has reviewed it in camera. See (Doc. No. 121). Plaintiff argues that the HCI Report is direct evidence of a hostile work environment and/or constructive discharge as well as evidence that Defendants C.O.R.E. and Inlivian were aware of Defendant Nathan's failure to comply with certain HUD regulations and FHA policies and therefore establishes liability for negligent supervision and retention. The Court has carefully examined the HCI report and agrees with Defendants that it does not provide

6

an evidentiary basis to establish any of Plaintiff's remaining claims. That is, the report does not include any information showing that Nathan was terminated for demanding that Plaintiff violate housing laws or regulations in performing Plaintiff's job responsibilities. Therefore, the HCI report is not relevant. Moreover, the HCI report contains inadmissible hearsay and therefore may not be submitted as evidence at trial. However, the Court finds that the parties may introduce otherwise admissible evidence at trial that Defendant Nathan's employment was terminated and the reasons for that termination.

B. **Defense of Public Official Immunity**

Before addressing the merits of Defendants' motion for summary judgment, the Court addresses Defendants' arguments that Plaintiff's claims against Defendant Nathan in her individual capacity for retaliation, hostile work environment, and constructive discharge are barred by public official immunity. "In North Carolina, official immunity protects public officials performing discretionary acts under color of authority from suit in their individual capacity" on state law tort claims. Evans v. Chalmers, 703 F.3d 636, 656–57 (4th Cir. 2012). "A public official may not be held individually liable for mere negligence, but may only be liable where her conduct is malicious, corrupt, or outside the scope of her authority." Dalenko v. Wake Cnty. Dep't of Human Servs., 157 N.C. App. 49, 56 (2003).

Here, to the extent that Plaintiff purports to bring state law tort claims against Defendant Nathan, the Court finds that Plaintiff's claims are not barred by public official immunity.[1] Plaintiff has raised genuine issues of material facts as to whether Defendant Nathan's acted with

---

[1] The parties argue public official immunity in their briefs, but the remaining claims against Defendant Nathan are not state law tort claims. Rather, Plaintiff frames them as constitutional or federal claims brought under Section 1983.

7

malice, corruption, or outside the scope of her lawful authority. More specifically, Plaintiff has at least raised issues of fact as to whether Nathan was acting outside the scope of her lawful authority. That is, Plaintiff has presented evidence raising a genuine issue of disputed material fact as to whether Nathan instructed Plaintiff to perform or to not perform certain duties, in violation of HUD regulations or FHA policies.[2]

### C. Plaintiff's Retaliation Claim

The First Amendment of the Constitution of the United States provides as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. It is well settled that public employees are "entitled to be protected from firings, demotions and other adverse employment consequences resulting from the exercise of their free speech rights, as well as other First Amendment rights." Alderman v. Pocahontas Cnty. Bd. of Educ., 223 W. Va. 431, 440 (2009). Plaintiff brings her First Amendment retaliation claim pursuant to 42 U.S.C. § 1983, which permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. Cooper v.

---

[2] While the parties do not address it in their pleadings, the North Carolina courts have made a distinction between public officials and public employees for purposes of public official immunity. While a public official may be entitled to immunity, a public employee is not entitled to such protection. Meyer v. Walls, 347 N.C. 97, 112 (1997) ("Officials cannot be held individually liable for damages caused by mere negligence in the performance of their governmental or discretionary duties; public employees can."). A public official is one whose position is created by the N.C. Constitution or the N.C. General Statutes and exercises some portion of sovereign power and discretion, whereas public employees perform ministerial duties. Block v. Cnty. of Person, 141 N.C. App. 273, 281 (2000). It appears to the Court that Defendant Nathan was a public employee rather than a public official. In any event, as stated, even if Nathan was a public official, there are genuine issues of fact as to whether she is entitled to immunity.

Sheehan, 735 F.3d 153, 158 (4th Cir. 2013).

To establish a retaliation claim under Section 1983 for expressing her First Amendment rights, Plaintiff must offer the following evidence: (1) she engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendant's conduct. Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017). An action is sufficiently adverse if it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (internal quotations omitted); Ferebee v. Manis, No. 7:19-cv-629, 2022 WL 897044, at *8 (W.D. Va. Mar. 28, 2022) (dismissing Section 1983 retaliation claim based on failure to establish that the defendant's conduct "constituted an adverse action so specifically adverse or chilling to [plaintiff's] First Amendment rights as to support § 1983 retaliation claim"). "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000).

"To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." Rhoads v. FDIC, 257 F.3d 373, 391 (4th Cir. 2001) (internal quotations omitted). This requires "evidence of conduct or statements that both reflect directly [on] the alleged discriminatory attitude and that bear directly on the contested employment decision." Id. at 391–92.

Courts have required that the nature of the retaliatory acts committed by a public

9

employer be more than de minimis or trivial. See Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir. 1999). Employer actions that can result in liability, however, include more than just actual or constructive discharge from employment. Id. Adverse employment actions may also include discharges, demotions, refusals to hire, refusals to promote, and reprimands. Id.;see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285–87 (1977); Rutan v. Republican Party, 497 U.S. 62, 79 (1990). Courts also consider the length of time between the protected activity (here, protected First Amendment speech), and the adverse action taken (the purported retaliation and informal warning from Nathan). See Constantine, 411 F.3d at 501 (holding that "[a] lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two") (quoting Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir.1998)); see also Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 127 (4th Cir. 2021) (stating that "[a]lthough there is no "bright-line rule" for temporal proximity, courts within our Circuit have found that shorter lapses of time similar to the three-month period at issue in the case before us are insufficient to infer a causal relationship without other evidence of a causal link. For example, this Court has held that a lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation "is too long to establish a causal connection by temporary proximity alone.") (citing Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233 (4th Cir. 2006)).

      Here, Defendants contend that any actions taken against Nathan before she resigned were not sufficiently adverse to rise to the level of retaliation for expressing her First Amendment rights. That is, as Defendants point out, Plaintiff voluntarily resigned—she was not expressly fired from her job. Defendants argue that, at worst, Plaintiff suffered minor inconveniences and

10

slights from Defendant Nathan, which do not rise to the level of retaliation. As to the informal warning, Defendants contend, and have presented evidence supporting their argument, that Nathan issued the informal warning based on Plaintiff's submittal of late monthly reports, incorrect and incomplete information entered on excel spreadsheets, and failing to contact presenters as requested by Nathan. Defendants further argue that Plaintiff fails to present any evidence showing the informal warning was substantially motivated by any protected speech, nor has Plaintiff presented evidence that Nathan held any animus towards Plaintiff for her prior speech. Defendants argue that the time between when Plaintiff purportedly raised her concerns about Nathan not following the law and when Plaintiff received the informal warning weighs against finding a causal connection between Plaintiff's protected speech and the informal warning.

Plaintiff has presented evidence sufficient to raise a genuine issue of fact as to whether Defendant Nathan's retaliatory acts, even if they did not rise to the level of actually firing Plaintiff, resulted in Plaintiff's fear of losing her job if she did not comply with Nathan's demands that she violate HUD regulations and FHA policies in doing her job. Here, Plaintiff has presented evidence that she raised her concerns to both Defendant Nathan and other employees at Inlivian regarding her belief that Nathan was instructing Plaintiff to violate certain HUD regulations and FHA policies, and that Nathan retaliated against Plaintiff when Plaintiff resisted following Nathan's instructions. As noted, Plaintiff contends that soon after she pushed back against Nathan's demands, Nathan retaliated against her by, among other things, not showing up for her monthly meetings, refusing to assist Plaintiff in her job duties, and preventing Plaintiff from completing certain work tasks. Plaintiff also cites as evidence of retaliatory conduct the informal warning she received on May 12, 2021. The Court finds that Plaintiff has raised

11

genuine issues of disputed facts as to this issue. She has also presented enough evidence to overcome summary judgment as to whether her speech was a "substantial or motivating factor" behind the adverse actions taken against her by Defendant Nathan. See Hughes v. Bedsole, 48 F.3d 1376, 1387 (4th Cir. 1995). Therefore, the Court denies Defendants' summary judgment motion as to this claim.

### D. Plaintiff's Constructive Discharge and Hostile Work Environment Claims

Next, the Court addresses Defendants' summary judgment motion as to the constructive discharge and hostile work environment claims.

First, to state a hostile work environment claim under Section 1983 and the Fourteenth Amendment, Plaintiff must demonstrate that: (1) she experienced unwelcome conduct, (2) the conduct was based on a protected characteristic under the Fourteenth Amendment, (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) the conduct is imputable to the employer. See Laurent-Workman v. Wormuth, 54 F.4th 201, 218 (4th Cir. 2022); Chapman v. Oakland Living Ctr., Inc., 48 F.4th 222, 229 (4th Cir. 2022). Conduct is actionable only if it creates both an objectively and subjectively hostile work environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993).

Courts have held that alleged nitpicking, micromanaging, unfavorable job assignments, and pretextual write-ups are insufficient to create a hostile work environment. See, e.g., Guillen v. Esper, No. 1:19-cv-1206, 2020 WL 3965007, at *14 (E.D. Va. July 13, 2017) (finding that plaintiff's allegations of nitpicking, personality conflicts, disliked assignments, and generalized workplace grievances could not establish that the issues were based on plaintiff's protected characteristic and were not enough to state a hostile work environment claim). Moreover, mere rude or insensitive treatment cannot, as a matter of law, sustain a hostile work environment

claim. See, e.g., Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019).

As to Plaintiff's constructive discharge claims, "[t]he constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that [her] 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Green v. Brennan, 578 U.S. 547, 555 (2016) (quoting Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)). There are two elements to a constructive discharge claim: "First, a plaintiff must show that his working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign. Second, a plaintiff must actually resign because of those conditions." Perkins, 936 F.3d 196, 211–12 (4th Cir. 2019) (quoting Green, 578 U.S. at 555).

It is well settled that the Fourteenth Amendment does not create "a general civility code for the American workplace." Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 80 (1998). Rather, the "conduct must . . . amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 1998). "[D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004)); see also James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 378 (4th Cir. 2004) (same); Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 244 (4th Cir. 1997) (being ignored by co-workers and top management was insufficient to establish constructive discharge).

A constructive discharge claim may be based on the same facts that give rise to an employee's hostile work environment claim. See Pa. State Police v. Suders, 542 U.S. 129, 147 (2004)). "A plaintiff who advances such a compound claim must show working conditions so

13

intolerable that a reasonable person would have felt compelled to resign." Id. This requires a showing of the requirements of both a hostile work environment claim and a constructive discharge claim. Evans v. Int'l Paper Co., 936 F.3d 183, 192 (4th Cir. 2019).

To support her hostile work environment and constructive discharge claims, Plaintiff has presented evidence that Nathan instructed Plaintiff to perform her job responsibilities in ways that were not in compliance with HUD regulations and FHA policies, and then when Plaintiff complained, Nathan began skipping certain work meetings with Plaintiff, walked past Plaintiff's office without speaking to her, and issued her an informal write up on May 12, 2021. (Pl. Dep. 126:16–127:6). Plaintiff maintains that she felt targeted, intimidated, and fearful to perform the essential functions of her job because of Defendant Nathan's instructions and ultimately felt she had to resign. (Doc. No. 49, Amended Compl. ¶¶ 100–05).

In arguing that Plaintiff was not constructively discharged, Defendants note that, in her deposition, Plaintiff testified she "had no real inclination that I would have to resign from Inlivian…it was a really great atmosphere and job at that time…" (Pl. Dep. at 85:20–22). Moreover, when asked if anything changed in her employment between April of 2020 and her resignation, Plaintiff testified that her employment did not change. (Pl. Dep. at 103:11–15). Finally, Plaintiff testified that if she had been offered to take a different job at Inlivian in response to her resignation letter, she would have accepted it. (Id. at 109:9–13, 134:20–23). Defendants also argue that the extended period between Plaintiff' notice of resignation on June 8, 2021, and the end of her employment on July 30, 2021, further undermines any inference of a constructive discharge. See e.g., Pfannenstiel v. Kansas, No. 5:21-cv-4006, 2023 WL 4623848, at *16 (D. Kan. July 19, 2023), aff'd, No. 23-3145, 2024 WL 3534142 (10th Cir. July 25, 2024) (granting summary judgment on a constructive discharge claim, and holding that the plaintiff

gave notice "on July 23, 2020, but didn't retire until more than a month later, after providing notice. … This delay cuts against any claim she was constructively discharged.").

On the other hand, Plaintiff presented at least some evidence to support her claim that Defendant Nathan instructed her to violate specific HUD regulations and FHA policies. As the Court noted at the summary judgment hearing, if Defendant Nathan demanded that Plaintiff violate fair housing laws and regulations in performing her job and then punished Plaintiff for failing to do so—this <u>could</u> rise to the level of a hostile work environment. Plaintiff has presented evidence to show that, following her complaints, Plaintiff faced a pattern of escalating retaliation where she was prevented from doing her job and Defendant Nathan refused to supervise her, including deliberate exclusion from supervisory meetings, refusal to respond to work-related communications, unjustified disciplinary actions, and public humiliation that chilled or adversely affected Plaintiff's desire to engage in her protected right to report concerns and to do things according to procedure. The Court finds that there are genuine issues of disputed fact as to Plaintiff's hostile work environment and constructive discharge claims. The Court will deny both parties' summary judgment motions as to these claims.

**E. Plaintiff's Claim against Defendants Inlivian and C.O.R.E. for Negligent Retention and Supervision**

As to her last claim against Defendants Inlivian and C.O.R.E., Plaintiff alleges those Defendants negligently supervised and retained Defendant Nathan by failing to correct the tortious actions of Defendant Nathan. "Plaintiffs alleging negligent supervision or training must first make an underlying showing of a negligence claim as to an employee, and then demonstrate that the employee was negligently trained or supervised." <u>Launi v. Hampshire Cnty. Prosecuting Attorney's Office</u>, 480 F. Supp. 3d 724, 733 (N.D.W. Va. 2020) (quoting <u>Taylor v. Cabell</u>

15

Case 3:23-cv-00846-MOC-SCR     Document 141     Filed 08/07/25     Page 15 of 16

Huntington Hosp., Inc., 208 W. Va. 128, 538 S.E.2d 719, 725 (2000)). Plaintiff's claim for negligent supervision against Inlivian and C.O.R.E. requires a showing that they failed to properly supervise Nathan and, as a result, Nathan committed a negligent act which proximately caused Plaintiff's injury. Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 744 (4th Cir. 1997). Here, the Court denies summary judgment for the same reasons that the Court denies summary judgment as to Plaintiff's other claims. That is, there are genuine issues of fact as to whether Plaintiff was subjected to First Amendment retaliation, and whether she was subjected to a hostile work environment and constructively discharged. Her negligent retention or supervision claims depend on her other claims. Thus, summary judgment is also denied as to this claim.

## IV. CONCLUSION

For the reasons stated herein, the Court will deny both parties' summary judgment motions, and this action shall proceed to trial.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 111), is **DENIED**.

2. Plaintiff's Motion for Partial Summary Judgment as to Liability, (Doc. No. 89), is **DENIED**.

3. This action shall proceed to trial.

Signed: August 6, 2025

Max O. Cogburn Jr
United States District Judge