UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:23-CV-846-MOC-SCR

| | |
|---|---|
| TONYA LIGHTNER<br>*Plaintiff*,<br><br>v.<br><br>INLIVIAN., f/n/a HOUSING AUTHORITY<br>OF THE CITY OF CHARLOTTE, N.C.;<br>C.O.R.E. PROGRAMS, INC.<br>AND MONICA NATHAN, In Her<br>Individual AND Official Capacity;<br><br>*Defendants.* | **PLAINTIFF'S OPPOSITION TO<br>DEFENDANTS' 59(a) MOTION**<br><br><br><br><br>**Electronically Filed** |

**NOW COMES**, Plaintiff, Tonya Lightner, by and through her counsel of record, Shayla C. Richberg, and hereby opposes Defendants' Motion for a new trial pursuant to Rule 59(a) of the Federal Rules for Civil Procedure. [DE-188.1] and shows the court as follows:

## <u>INTRODUCTION</u>

After a five-day trial where eight elderly and disabled witnesses testified about discrimination, they personally experienced in Mrs. Lightner's workplace, a jury awarded Tonya Lightner $2,346,507.10 for the devastating harm she suffered when forced to choose between violating federal law and losing her livelihood. The jury found Nathan individually liable for hostile work environment and constructive discharge, awarding $1.00 in nominal damages after hearing prejudicial testimony from Nathan that in "early '20 she was diagnosed with end-stage renal disease" [Trial Tr. vol.4, p.127-128]. When Plaintiff objected, the Court overruled, despite ruling at sidebar that such testimony would be excluded. While a limiting instruction followed, the

1

damage was done- as evidenced by the nominal damages awarded. Now, Defendants seek to overturn the verdict they worked to prejudice in their favor, recycling arguments this Court already rejected at summary judgment and twice under Rule 50(a).

Most tellingly, while crying "prejudice," Defendants themselves attempted to prejudice this Court by submitting Plaintiff's settlement demand letter to the judge's chambers - a document protected under Federal Rule of Evidence 408, after Defense Counsel's request to be copied on future emails had already been discussed with the Court. (Exhibit A). Perhaps most disingenuously, Defendants claim prejudice from discovery rulings while failing to disclose these were merely magistrate recommendations, not binding orders, that Plaintiff timely objected to under Rule 72 [DE-43, DE-82, DE-117]. The Federal Magistrates Act requires that "ultimate decisions be made solely by the district court, not the magistrate," and magistrate recommendations "hold no presumptive weight." Elijah v. Dunbar, 66 F.4th 454, 459 (4th Cir. 2023). Defendants' selective presentation exemplifies the procedural gamesmanship permeating their motion.

This hypocrisy permeates their entire motion: they claim prejudice from elderly victims testifying about discrimination, yet these were the very people Mrs. Lightner was forced to discriminate against daily. They forced her to delete Linda Bell's application because she was elderly, made her watch Ruby Alexander break down in her office, and required Mrs. Lightner to violate federal law because it was "Nathan's program and she had to do what she said do" [Trial Tr., vol. 2 p.224], then claim these acts have no bearing on why she resigned.

The jury heard overwhelming evidence that Monica Nathan forced Mrs. Lightner to discriminate against society's most vulnerable citizens or lose her career. When Mrs. Lightner complained, Nathan told her to "seek counseling" [Trial Tr., vol. 2 p.160], abandoned her

supervisory duties by repeatedly missing meetings ("February 10th, no meeting; March 10th, no meeting; April 7th, no meeting") [Trial Tr., vol. 3 p.222], and declared "This is [Nathan's] program, and [Plaintiff] had to do what she said to do" [Trial Tr., vol. 2 p.224]. Dr. Lovings certified Mrs. Lightner suffered from a mood disorder that would last her "lifetime" due to "her supervisor" (Trial Exhibit 6), permanent psychiatric disability so severe she resigned rather than continue using approved FMLA leave. Mrs. Lightner testified: "I don't believe I took any days during that time" [Trial Tr., vol. 3 p.109], demonstrating the environment was so intolerable she could not continue even with protected leave.

The jury's sophisticated analysis is evident in their verdict structure: substantial damages against corporate defendants who retained Nathan for sixteen months despite complaints, but only $1.00 against Nathan individually after her prejudicial "end-stage renal disease" testimony [Trial Tr., vol. 4 p.128]. This nuanced verdict shows the jury carefully weighed evidence against each defendant individually, not the wholesale prejudice Defendants claim.

Defendants' procedural complaints ring hollow given their own failures. They never filed an Answer to the Amended Complaint, thereby admitting all factual allegations under Rule 8(b)(6). They actively litigated emotional distress throughout discovery, demanding "each physician, psychiatrist, psychologist, counselor" and ten years of mental health records establishing emotional distress damages [Exhibit 47, DE-87.1, p. 10-12]. Having received comprehensive responses detailing PTSD and Major Depressive Disorder, cross-examined witnesses for five days, chosen not to depose treating providers despite a three-month extension, conceded during summary judgment that Mrs. Lightner subjectively experienced hostile work environment [DE-126, p. 27], and failed to file motions in limine on emotional distress, Defendants cannot claim

"manifest error" when the Court conformed pleadings to evidence they developed. [Exhibit 47 – DE 87.1 p.10-12]

The verdict aligns with overwhelming evidence: medical documentation of permanent psychiatric injury (Exhibit 6), seven managers' joint complaint about Nathan (Exhibit 15), and subsequent HCI investigation resulting in three terminations. Most fundamentally, Defendants' motion is procedurally defective-- no judgment has been entered 54 days after verdict. Under Rule 59(b), motions must be filed within 28 days of judgment entry. Without judgment, Defendants' motion is premature. As demonstrated below, Defendants cannot meet their burden under Rule 59(a), and their motion should be denied.

## STANDARD OF REVIEW

Under Rule 59(a), a new trial should be granted only if the verdict "(1) is against the clear weight of the evidence, (2) is based on evidence which is false, or (3) will result in a miscarriage of justice, even if there is substantial evidence that would prevent a directed verdict." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). The motion "should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." United States v. Timms, 537 F. App'x 265, 267 (4th Cir. 2013).

Critically, "a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." Id. Arguments not preserved at trial are waived. Sines v. Spencer, No. 23-1112, 2025 LX 232574, at 5-6 (4th Cir. Mar. 27, 2025)

Additionally, Rule 59(b) requires filing "no later than 28 days after the entry of judgment", a jurisdictional deadline that cannot be extended. Fed. R. Civ. P. 6(b)(2). Without entry of

4

judgment, the filing period never begins. *See* <u>Rhodes v. Comcast Cable Commc'ns Mgmt., LLC,</u> No. 19-1310, at *2-3 (4th Cir. June 9, 2023).

None of these grounds exist here. The verdict aligns with overwhelming evidence, no false evidence was presented, and no miscarriage of justice occurred. Defendants' motion is procedurally premature (no judgment entered), substantively forfeited (arguments not preserved), and fails to demonstrate the "manifest error" or "substantial reasons" required for this extraordinary remedy.

## <u>ARGUMENT</u>

### I. DEFENDANTS' RULE 59 MOTION IS PROCEDURALLY DEFECTIVE AND FORFEITS KEY ARGUMENTS

Defendants' motion fails at the threshold. Rule 59(b) requires filing "no later than 28 days after the entry of judgment." As of October 18, 2025- 54 days after verdict- no judgment has been entered. Without judgment, the 28-day clock cannot begin, rendering Defendants' motion premature. See, <u>Rhodes v. Comcast Cable Commc'ns Mgmt., LLC,</u> No. 19-1310, at *2-3 (4th Cir. June 9, 2023). Plaintiff raised this issue in her Emergency Motion for Entry of Judgment [DE-175] and Opposition to Defendants' Motion for Extension [DE-170], incorporated herein by reference. Rule 6(b)(2) explicitly prohibits courts from extending Rule 59 deadlines: the court "must not extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b)."

While this procedural defect requires denial, the Court need not reach this issue given the motion's failure on the merits.

Even if considered, Defendants forfeited their primary arguments through failure to preserve them. Under <u>Sines v. Spencer</u>, arguments not raised in Rule 50(a) motions are forfeited post-trial. 2025 LX 232574, at 5-6 (4th Cir. Mar. 27, 2025). <u>Timms</u> confirms "a new

5

trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." 537 F. App'x at 267.

**Workers' Compensation Exclusivity** exemplifies this forfeiture. This affirmative defense appears nowhere in Defendants' Rule 50(a) motion, first raised October 6, 2025- six weeks post-trial. Workers' Compensation exclusivity must be pled in an Answer under Rule 8(c), which Defendants never filed for the Amended Complaint, and preserved through Rule 50(a). Defendants did neither. Having bifurcated to exclude evidence of willful and wanton conduct, they cannot argue Plaintiff failed to prove the *Pleasant* exception they prevented her from presenting.

**Mitigation defense** similarly fails. Mitigation requires pleading under Rule 8(c) in an Answer- which Defendants never filed. Their expert reports were fundamentally deficient: wrong geographic markets (Charlotte and Houston where Plaintiff didn't live), no disability analysis despite PTSD/Major Depressive Disorder diagnoses, and experts admitted at trial they lacked critical information about Plaintiff's mental health and homelessness after Hurricane Beryl. The jury reasonably rejected this flawed analysis.

**Rule 15(b) amendment** cannot be erroneous when Plaintiff maintains that the operative complaint sufficiently plead both NIED and IIED as the underlying tortious conduct for Negligent Supervision and Retention and when Defendants never objected during trial to emotional distress evidence they actively discovered for a year. Defendants demanded Mrs. Lightner to detail "each physician, psychiatrist, psychologist, counselor" and ten years of mental health records establishing emotional distress damages [Exhibit 47, DE-87.1, p. 10-12], cross-examined witnesses about emotional distress for five days, thus cannot claim error when the Court conformed pleadings to evidence they developed.

**Purported Discovery limitations** were non-binding magistrate recommendations Plaintiff timely objected to [DE-43, DE-82, DE-117], triggering de novo review. Under Elijah v. Dunbar, magistrate recommendations "hold no presumptive weight." 66 F.4th 454, 459 (4th Cir. 2023). Defendants cannot claim error from non-final recommendations this Court had full authority to reject. Their selective presentation, omitting Plaintiff's preserved objections, exemplifies the procedural gamesmanship permeating their motion.

None of Defendants' newly raised arguments meet the extraordinary standard for fundamental error causing gross injustice, particularly when their own failures: no Answer filed, deficient expert reports, misrepresenting magistrate recommendations as binding, created any alleged prejudice. Their forfeiture provides an independent basis for denying their Rule 59 motion.

## II. THE VERDICT IS NOT AGAINST THE CLEAR WEIGHT OF EVIDENCE

Defendants cannot meet their burden of showing the verdict is "against the clear weight of the evidence." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). Far from contradicting the evidence, the jury's verdict aligns perfectly with overwhelming proof that Monica Nathan created a hostile work environment so severe it forced Mrs. Lightner's constructive discharge, and that Defendants Inlivian and C.O.R.E. negligently retained Nathan despite sixteen months of notice.

The medical evidence alone justified the verdict. Dr. Lovings certified that Mrs. Lightner suffered from anxiety, depression, and a mood disorder that would last her "lifetime" and prevented her from performing essential job functions due to "her supervisor" causing persistent flare ups (Trial Exhibit 6). This wasn't temporary workplace stress; this was permanent psychiatric disability documented just five days after Nathan's retaliatory warning. Mrs. Lightner developed

PTSD and Major Depressive Disorder [Trial Tr., vol. 3 p.18], conditions so severe she chose to resign rather than continue using her approved intermittent FMLA leave. Mrs. Lightner testified: "I don't believe I took any days during that time" [Trial Tr., vol. 3 p.109], proving the environment was so intolerable that even protected leave couldn't make it bearable.

The hostile environment was corroborated by multiple witnesses who confirmed Nathan's pattern of abuse. Seven managers jointly complained about Nathan's management in April 2021 (Exhibit 15), with Alethea Ramey testifying "it was all the program managers" [Exhibit 15, Trial Tr., vol. 2 p.80], who united to address Nathan's conduct. (Exhibit 15) When confronted with these concerns, Nathan "said that it was overwhelming, and she basically got off the call" [Trial Tr., vol. 2 p. 81], demonstrating her refusal to address legitimate workplace concerns. Shonte Hoover confirmed Nathan told Mrs. Lightner she couldn't speak to Hoover [Trial Tr., vol. 3 p.189], isolating Mrs. Lightner from necessary work communications. Tomico Evans admitted "several staff had some of the same concerns" [Trial Tr., vol. 3 p.218-219] about Nathan, establishing a pattern of misconduct.

Most damning was the direct evidence of forced violations of federal law. Mrs. Lightner testified Nathan declared "This is [Nathan's] program, and [Plaintiff] had to do what she said to do" [Trial Tr., vol. 2 p.157], forcing her to discriminate against elderly and disabled applicants. When Mrs. Lightner reported experiencing a "hostile work environment," Nathan's response was to tell her "you need to go seek counseling" [Trial Tr., vol. 2 p.160]. This made Mrs. Lightner feel "humiliated... embarrassed... belittled... even more fearful of my job" [Trial Tr., vol. 2 p.197].

Defendants fundamentally misunderstand relevance under Federal Rule of Evidence 401 by fixating on whether program participants knew Mrs. Lightner. Rule 401 requires only that evidence have "any tendency to make a fact more or less probable." Fed. R. Evid. 401. These

witnesses didn't need to know Mrs. Lightner to be relevant, they needed to corroborate that the workplace was permeated with discrimination, making Mrs. Lightner's working conditions intolerable. Their testimony about experiencing discrimination IS testimony about Mrs. Lightner's employment- because being forced to implement that discrimination against them was the very essence of what made Mrs. Lightner's workplace intolerable.

Under Rule 403, evidence is excluded only if its probative value is "substantially outweighed" by unfair prejudice- a high bar that "tilts yet again toward admissibility." United States v. Ferguson, 140 F.4th 538, 540 (4th Cir. 2025). This testimony wasn't prejudicial- it was direct evidence of the discrimination Mrs. Lightner was forced to implement, proving both the objective severity of her working conditions and why resignation was her only option.

The pre-2020 witnesses were crucial in establishing that Nathan created and led this discriminatory system before Mrs. Lightner arrived, removing any doubt that Mrs. Lightner was acting on her own. Charitee Hill testified she applied in "2016" and again in "2018" [Trial Tr., vol. 2 p.35-36], completing all requirements but never receiving assistance. Tawanna White similarly applied in "2016" [Trial Tr., vol. 2 p.25], received congratulations emails directly from Nathan, but was never assigned a counselor. Querida Shelton testified that in 2016, Nathan personally instructed applicants "not to email" but to "call" instead [Trial Tr., vol. 2 p.20], preventing the paper trail that would expose discrimination.

Additionally, the program witnesses addressed the exact fear Mrs. Lightner had, being blamed for discrimination she was forced to implement. Mrs. Lightner testified: "God forbid, if an audit or HUD had came down, my signature is on all these documents. I would have taken the fall for that, not Monica" [Trial Tr., vol. 2 p.225]. This fear was validated when Ontania Daughtery filed a complaint against Mrs. Lightner, testifying: "I didn't know who to... who is to blame, but I

feel like if you work there, then, you know, I'm coming to whoever" [Trial Tr., vol. 2 p.97]. The pre-2020 witnesses proved Nathan, not Mrs. Lightner, was the architect of the discrimination.

The during-employment witnesses demonstrated the human devastation Mrs. Lightner was forced to inflict daily. Prequalified Ruby Alexander "broke down and cried" for about five-minutes [Trial Tr., vol. 2 p.60] in Mrs. Lightner's office when told her application had disappeared. Linda Bell- who completed all program requirements- died waiting for housing, her application deleted because she was elderly. Jeffrey Young, a prequalified disabled veteran, testified he "couldn't get none of the workers to process my application" [Trial Tr., vol. 2 p.111] when he refused Nathan's preferred lenders. Brandy Winston, "prequalified" was forced to work with Nathan's lenders and told "by [her] being disabled and handicapped, [she] didn't deserve a home and that [she] was the bottom of the barrel" [Trial Tr., vol. 2 p.43], while prequalified Carola Lewis confirmed she was steered to only "BB&T and SunTrust" [Trial Tr., vol. 2 p.68] despite a longer list of lenders. (Exhibit 76).

Critically, the post-2021 witnesses proved the discrimination continued after Mrs. Lightner's departure, confirming Nathan was the culprit and validating Mrs. Lightner's constructive discharge. Charitee Hill applied again in "2023"- still without success [Trial Tr., vol. 2 p.35]. Tawanna White reapplied in "2023"- still waiting [Trial Tr., vol. 2 p.25]. Yet despite this ongoing discrimination, Inlivian and C.O.R.E. continued to retain Nathan, addressing only her "managerial issues" while ignoring the discrimination- suggesting what Plaintiff's believed to be evidence of discrimination further up the chain further warranting Plaintiff's jury award. Tomico Evans's June 2021 warning to Nathan mentioned only "communication" problems [Exhibit 7], conspicuously omitting the discrimination Mrs. Lightner had reported. This deliberate blindness,

treating systematic discrimination as merely a "management style" issue, justified Mrs. Lightner's conclusion that resignation was her only option.

Similarly, testimony from other employees establishes the pervasive retaliation culture that contextualizes Mrs. Lightner's experience. Siera Tillman testified: "I wouldn't report anything there because it's going to get back to whomever you reported it on, and you're probably going to end up fired" [Trial Tr., vol. 2 p.129]. This wasn't paranoia, after reporting violations to HR with explicit confidentiality requests, HR immediately told Tillman's supervisor and she was terminated despite five years of exemplary service [Trial Tr., vol. 2 p.127-128]. Felicia Logan confirmed the pattern: after complaining, "Things got different for me... The atmosphere... became difficult"[Trial Tr., vol. 2 p. 145-146]. Logan also testified that Ryan [Grace] (misidentified in the transcript as "Brian"), who had complained about Monica Nathan, was later terminated, further proof that challenging Nathan meant losing your job [Trial Tr., vol. 2 p.142]. In this context, Mrs. Lightner's complaints- Nathan walking past her office without speaking and refusing to supervise her were not "petty slights" rather adverse actions that carried implicit threats. When complainers get fired and HR betrays confidences, even subtle hostility signals danger. The jury understood that in an organization where speaking up costs careers, Mrs. Lightner's constructive discharge wasn't just reasonable but inevitable after she had already reported violations."

Moreover, Expert Renee Tarver's testimony was both necessary and properly admitted after Defendants opened the door by claiming their Moving to Work (MTW) status justified the discrimination.

Throughout trial, Defendants repeatedly invoked their MTW designation as a defense, with Tomico Evans testifying that MTW "allows a PHA to operate differently from the traditional or regular, standard regulations." [Trial Tr., vol. 4 p.21]. Yet when directly challenged to show where

in their MTW plans this alleged flexibility allowed Defendants to "select participants out of order" or "flexibility to discriminate", Evans admitted: "I'm not gonna agree to that because I'm not reading verbatim what's in this plan" Id. When pressed further about whether the MTW plans gave Inlivian "the flexibility to discriminate against applicants and select them out of order," Evans could not point to any such provision. [Trial Tr., vol. 4 p.21-22]. The Court itself recognized Evans didn't know what was in the plans, asking "You don't know what's in these plans; right?" to which Evans responded, "No. Based on the time frames, no. No." Id. Having asserted MTW status and the Admin Plan as a defense while being unable to substantiate it, Defendants cannot claim prejudice when Plaintiff's expert explained why MTW status nor the Admin plan permit discrimination against elderly and disabled applicants. Expert testimony became necessary precisely because Defendants invoked a technical regulatory defense they couldn't support with their own exhibits. Under Federal Rule of Evidence 106, when a party introduces a concept- here, MTW flexibility- the opposing party is entitled to provide context and completion. Tarver's testimony merely explained what Defendants' own witnesses could not: that no HUD program, including MTW, permits discrimination based on age or disability.

The corporate defendants deliberate indifference was equally clear. Sandra Pizarro admitted that when Mrs. Lightner asked her to investigate complaints from C.O.R.E. employees, she refused: "I told her I could not possibly interview all C.O.R.E. employees... It was a unit of about 50 employees" [Trial Tr., vol. 4 p.102]. Despite acknowledging "investigating workplace complaints is a core function of HR" [Trial Tr., vol. 4 p.103], Pizarro chose to protect one problematic manager rather than investigate fifty employees' concerns. Tomico Evans told Mrs. Lightner she "believed [her] manager" [Trial Tr., vol. 2 p. 225] and provided no support, then

directed Nathan to issue the retaliatory warning despite knowing about the managers' joint complaint.

The subsequent validation of Mrs. Lightner's complaints destroys any suggestion the verdict lacks support. The 2023 HCI investigation resulted in terminations of Nathan, Evans, and Pizarro- three executives fired for the very conduct Mrs. Lightner reported. Current HR Director Kenya Lewis confirmed discrimination was "water cooler talk" [Trial Tr., vol. 4 p.111] at Inlivian and that "Employees in C.O.R.E. were not satisfied with management" [Trial Tr., vol. 4 p.121] even after Mrs. Lightner's departure, proving the hostile conditions persisted and validating her constructive discharge.

The jury's sophisticated analysis further demonstrates the verdict's alignment with evidence. They found hostile work environment and constructive discharge while rejecting retaliation, showing careful parsing of distinct legal claims. They awarded substantial damages against corporate defendants who retained Nathan for sixteen months despite multiple complaints, while awarding only $1.00 against Nathan individually after her prejudicial testimony about "end-stage renal disease" [Trial Tr., vol. 4 p.128]. This nuanced verdict reflects thoughtful deliberation, not confusion or prejudice.

Defendants' claim that the verdict is against the clear weight of evidence is nothing more than disagreement with the jury's credibility determinations and factual findings- exactly what Rule 59(a) prohibits. The evidence overwhelmingly supported findings of liability, and the $2,346,507.10 award appropriately compensates for lifetime psychiatric treatment, lost career in a specialized field, and the trauma of being forced to discriminate against society's most vulnerable citizens.

13

III.    **DEFENDANTS MISCHARACTERIZE THE TRIAL TESTIMONY TO IMPROPERLY ATTACK DAMAGES**

Throughout their brief, Defendants systematically misrepresent Mrs. Lightner's testimony by cherry-picking isolated phrases while ignoring context and clarifying statements. These are not mere interpretive differences, but fundamental distortions designed to undermine the $2,346,507.10 verdict by falsely claiming Mrs. Lightner testified she experienced no emotional distress, no fear, and no employment changes.

***Defendants Distort Testimony About Changed Working Conditions***

When asked "Did anything change in your job between January or February of 2020 and June of 2021?" Mrs. Lightner responded: "You mean the things that I needed to do, my daily duties? None of that -- none of my daily duties ever changed" [Trial Tr., vol. 3 p.104-105]. This clearly refers to job responsibilities, not working conditions. She clarified she meant "my daily duties" [Trial Tr., vol. 3 p.105], her technical responsibilities remained constant while her working conditions deteriorated catastrophically.

The evidence proves dramatic deterioration: Nathan abandoned supervision, leaving Mrs. Lightner waiting on Teams for "45 minutes, and she didn't show" [Trial Tr., vol. 2 p.158] with documented missed meetings: "February 10th, no meeting; March 10th, no meeting; April 7th, no meeting" [Trial Tr., vol. 3 p.222]. Nathan isolated her from necessary communications: "I must not meet with Shonte Hoover anymore without her knowing" [Trial Tr., vol. 2 p.156]. Nathan subjected her to daily humiliation: "Monica just stopped speaking to me. She walked past my office repeatedly... she wouldn't look" [Trial Tr., vol. 2 p.195]. This continued "until the day I left" [Trial Tr., vol. 3 p.88].

***Defendants Misrepresent Testimony About Fear and Emotional Distress***

Defendants cite "No, that is not one of the reasons" [Trial Tr., vol. 3 p.57] while omitting Mrs. Lightner's clarification: "I wouldn't say that it was not there, but that was not the sole reason" [Trial Tr., vol. 3 p.58]. She testified fear began when "Monica and I had the situation and she said, you do as I say. This is my program" [Trial Tr., vol. 3 p.58] and confirmed "I felt that way in the October 2020 meeting" [Trial Tr., vol. 3 p.106].

Similarly, they quote "I don't want to say it was emotional, no" [Trial Tr., vol. 3 p.106] about the warning while ignoring: "It didn't make me feel that way. I had already felt that way" Id. The warning was "retaliatory from the April meeting... and all of the things that had been transpiring" Id. She sought FMLA five days later- direct evidence of emotional distress requiring medical treatment.

Mrs. Lightner extensively described her suffering: "I have a dual diagnosis of anxiety, depression, and panic attacks that consistently still continue thus after my resignation. I have nightmares and PTSD" [Trial Tr., vol. 3 p.14]. "I was feeling vulnerable... feeling like I was in a hostile environment... feeling fear for my job... feeling bullied... feeling intimidated" [Trial Tr., vol. 2 p.161-162]. "I was embarrassed. My peers, I felt humiliated" [Trial Tr., vol. 2 p.197].

***Working Through FMLA Leave Demonstrates Severity, Not Absence of Distress***

Defendants argue not using approved FMLA during her notice period proves no distress. This ignores her testimony: "I was doing that report up until hours of the night. It could have been 10 or 11 o'clock... I wanted to make sure the clients were still served" [Trial Tr., vol. 3 p.109]. She worked through documented "panic attacks, anxiety, and... depression" [Trial Tr., vol. 2 p.217] to secure $200,000: "if I hadn't completed the LISC report... They would have pulled it" [Trial Tr.,

15

vol. 2 p.229]. Working through psychiatric symptoms to protect vulnerable residents demonstrates profound suffering warranting compensation.

**D. Mrs. Lightner Repeatedly Complained About Discrimination**

Defendants claim she never complained about discrimination. The record proves otherwise. She told Nathan: "it was discriminating, and it was a violation of the fair housing laws" [Trial Tr., vol. 2 p.157]. She reported Nathan forcing her to "skip people over the line... not to manage the waitlist properly" [Trial Tr., vol. 2 p.163]. She told Pizarro about "senior, elderly, and disabled about them being discriminated against" [Trial Tr., vol. 3 p.90]. Being forced to discriminate caused severe distress: "Mentally it was just --I just felt so horrible... because I was doing these things to the elderly, disabled" [Trial Tr., vol. 2 p.197].

**E. Constructive Discharge Was Not Voluntary**

The evidence proves Mrs. Lightner had no choice: "I was going against the HUD rules and regulations... God forbid, if an audit or HUD had came down, my signature is on all these documents. I would have taken the fall for that, not Monica" [Trial Tr., vol. 2 p.225]. Evans told her "that was my experience; it was not hers... I believe my manager because that's what I hire them for" Id. After exhausting all remedies, reporting to Nathan, HR, Evans, through joint manager complaint- nothing changed.

The medical evidence confirms permanent injury. Dr. Lovings certified Mrs. Lightner's mood disorder would last her "lifetime" with "Her supervisor job requirements impaired when mood disorder flares" (Trial Exhibit 6). This permanent psychiatric disability requiring lifetime treatment fully supports the $2,346,507.10 verdict for: lifetime psychiatric treatment, lost

specialized career after sixteen years, and trauma of being forced to discriminate against vulnerable citizens.

These systematic misrepresentations demonstrate why the jury rejected Defendants' version and awarded substantial damages. The actual testimony- read in context with medical evidence- fully supports the verdict. As this Court recognized, emotional distress damages are "peculiarly within the province of the jury." <u>Bishop v. Byrne,</u> 265 F. Supp. 460, 464-65 (S.D.W. Va. 1967). These damages flow from intolerable conditions Defendants created, not the distorted fragments they present.

## IV.    THE ALLEGED JUROR MISCONDUCT DOES NOT WARRANT A NEW TRIAL AND DEFENDANTS' DELAY TACTICS HAVE FORFEITED ANY RIGHT TO CHALLENGE JURY AVAILABILITY

Defendants' juror misconduct claim reveals their strategy: having delayed judgment entry for 54 plus days to prevent the punitive damages trial, they manufacture "misconduct" from a post-verdict expression of sympathy. A single statement- "I'm sorry you had to go through that"- made after the compensatory verdict cannot retroactively invalidate that verdict or disqualify the jury from the punitive phase Defendants have prevented. (Exhibit B)

**Defendants' Strategic Delay Waives Any Claim of Prejudice**

The timeline exposes manipulation. After the August 25, 2025, verdict and August 27 *Charlotte Observer* article, Defendants claim they "immediately brought [this] to the Court's attention," yet took no action for five weeks: no voir dire motion, no evidentiary hearing, nothing while the jury remained available. They waited until October 6, 2025, 40 days later, to raise it in their Rule 59(a) motion, preventing the punitive trial while creating jury availability issues they now exploit.

17

No judgment has been entered as of October 20, 2025, 56 days post-verdict [DE-175]. Under N.C. Gen. Stat. § 1D-30, "the same trier of fact that tried the issues relating to compensatory damages [must] try the issues relating to punitive damages." Haarhuis v. Cheek, 255 N.C. App. 471, 473 (2017). Defendants' delay created the very availability concerns they cite, prejudicing Plaintiff who has lost 56 days of post-judgment interest and faces a jury that may have forgotten key facts after nearly two months.

**Post-Verdict Sympathy Is Not Misconduct and Rule 606(b) Bars Any Inquiry**

Federal Rule of Evidence 606(b) absolutely bars inquiry into this juror's statement, prohibiting testimony about "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions." The only exceptions, "extraneous prejudicial information" or "outside influence", don't apply to post-verdict sympathy. This Court cannot question the juror about what he meant.

The Fourth Circuit requires actual prejudice, not speculation. See, United States v. Smith, 919 F.3d 825, 834 (4th Cir. 2019). Courts, prohibit post-verdict inquiry into juror mental processes. See, Tanner v. United States, 483 U.S. 107, 117 (1987). Here, the statement occurred after verdict and discharge, when no restrictions applied.

Even Hicks v. Anne Arundel Cnty., 637 F. Supp. 3d 335, 340-42 (D. Md. 2022), aff'd, 110 F.4th 653 (4th Cir. 2024), supports denial. There, a juror told plaintiff "I wish I could give you a hug **during trial**, violating instructions not to interact with parties. The court simply excused that juror without questioning, it didn't grant a new trial. Here, the statement occurred **after verdict** when no instructions prohibited interaction. If mid-trial sympathy only warrants excusing one juror, post-verdict sympathy cannot overturn a completed verdict.

The ambiguous statement, "I'm sorry you had to go through that", could mean the five-day trial, three-year litigation, or simple human empathy after hearing Ruby Alexander "broke down and cried" for "five minutes" [Trial Tr., vol. 2 p.60], needed counseling "because it was so painful" [Trial Tr., vol. 2 p.61], and Linda Bell died waiting for housing and to serve as a witness.

**Any Prejudice Falls on Plaintiff, Not Defendants**

The only demonstrated prejudice is to Plaintiff. Nathan violated the Court's sidebar ruling by testifying about "end-stage renal disease" [Trial Tr., vol. 4 p.127-128], essentially telling the jury that she is dying. The Court instructed: "decide a case without bias, prejudice or sympathy," yet the jury awarded Nathan only $1.00, proving her improper testimony generated sympathy that reduced damages from potentially millions to one dollar. The irony is striking: Defendants seek new trial claiming juror sympathy toward Plaintiff while Nathan benefits from a $1.00 verdict created by sympathy. Judicial estoppel bars Defendants from taking inconsistent positions- they cannot accept sympathy's benefit for Nathan while claiming sympathy invalidates Plaintiff's verdict. If sympathy invalidates verdicts, Defendants should move to increase Nathan's damages, not seek a new trial. The jury's sophisticated analysis proves they followed law despite emotion, rejecting retaliation with lowest burden while finding hostile environment and constructive discharge requiring higher proof. They applied the instruction that constructive discharge requires proof "a reasonable person in the employee's position would have felt compelled to resign" [Jury Instructions], showing legal analysis, not emotion.

**Evidence, Not Sympathy, Supports the Verdict**

The $2,346,507.10 against corporate defendants reflects institutional failure. Pizarro refused to investigate 50 employees' complaints: "I told her I could not possibly interview all C.O.R.E. employees" [Trial Tr., vol. 4 p.102-103] despite acknowledging "investigating

19

workplace complaints is a core function of HR" [Trial Tr., vol. 4 p.103]. Seven managers complained jointly (Exhibit 15). The HCI investigation resulting in Nathan's, Evans's, and Pizarro's terminations validates the verdict.

**The Only Available Remedy Is a Limiting Instruction**

Even if concern existed, which it doesn't, the only remedy is what this Court used for Nathan's improper testimony: a limiting instruction for the punitive phase. Rule 606(b) bars voir dire, post-verdict statements cannot overturn completed verdicts, and Defendants' 56-day delay cannot be rewarded with a new trial.

For these reasons, the compensatory verdict should stand. At most, a limiting instruction for the punitive phase, not the complete new trial Defendants seek. Plaintiff is entitled to proceed with punitive damages before the same jury per N.C. Gen. Stat. § 1D-30.

## V. DEFENDANTS' DAMAGES ARGUMENTS MISCHARACTERIZE THE EVIDENCE AND IGNORE THE JURY'S CAREFUL EVALUATION

Defendants' attack on the $2,346,507.10 verdict reveals their fundamental misunderstanding of both the evidence presented and the legal standards for emotional distress damages. By cherry-picking isolated phrases while ignoring medical documentation and clarifying testimony, Defendants attempt to rewrite the trial record that the jury carefully evaluated over five days.

### A. The Medical Evidence Alone Justified Substantial Emotional Distress Damages

Defendants claim no evidence supports emotional distress damages, yet Dr. Lovings' FMLA certification provides devastating contemporaneous medical documentation (Exhibit 6). Completed just five days after Nathan's retaliatory warning, it established Mrs. Lightner suffered from a mood disorder that would last her "lifetime," preventing her from performing essential job functions due to "Her supervisor job requirements impaired when mood disorder flares." The

severity was quantified: "up to 10 days out of work per month" with required "Mental health counseling every 2 weeks" indefinitely.

Mrs. Lightner testified: "I have a diagnosis of PTSD. I have a diagnosis of manic depression. I have a diagnosis of panic and anxiety attacks" that "consistently still continue thus after my resignation" [Trial Tr., vol. 3, p. 14, 18]. HR Expert Robyn Hardy relied on these psychological assessments, testifying HR professionals "rely on psychological assessments" to "understand... how environmental factors in the organization impact employees" [Trial Tr., vol. 3, p. 124]. This medical evidence of permanent psychiatric disability requiring lifetime treatment alone supports substantial damages.

**B. Defendants Systematically Misrepresent Mrs. Lightner's Testimony**

Defendants cite Mrs. Lightner saying fear of termination was "not one of the reasons" for resigning [Trial Tr., vol. 3, p. 57] while omitting her clarification: "I wouldn't say that it was not there, but that was not the sole reason" [Trial Tr., vol. 3, p. 58]. She testified this fear began when "Monica and I had the situation and she said, you do as I say. This is my program" [Trial Tr., vol. 3, p. 58].

Similarly, they claim the informal warning didn't affect her emotionally, citing "I don't want to say it was emotional, no" [Trial Tr., vol. 3, p. 106] while ignoring: "It didn't make me feel that way. I had already felt that way" [Trial Tr., vol. 3, p. 106]. The warning was "retaliatory from the April meeting... and all of the things that had been transpiring" [Trial Tr., vol. 3, p. 106]. That she sought FMLA leave five days later demonstrates severe emotional impact.

While Mrs. Lightner said Nathan walking past "didn't upset me per se" [Trial Tr., vol. 3, p. 87], she extensively described cumulative effects: "I was feeling vulnerable... feeling like I was in a hostile environment... feeling fear for my job... feeling bullied... feeling intimidated" [Trial

Tr., vol. 2, p. 161-162]. After being told to seek counseling: "I was embarrassed. My peers, I felt humiliated" [Trial Tr., vol. 2, p. 197].

**C. The Jury Did Not Double-Count Back Pay and Lost Wages**

Defendants claim the jury improperly awarded both "back pay" and "lost wages," but this argument is directly contradicted by the trial record. During deliberations, the jury specifically asked the Court to clarify the distinction between back pay and lost wages, and Defendants themselves confirmed these were the same. The jury's request for clarification and the Court's response eliminate any possibility of double-counting. The $480,000 in economic damages represents four years of lost income at $65,000 annually [Trial Tr., vol. 3, p. 33-34] - a straightforward calculation based on undisputed salary evidence, not duplicative awards.

**D. Defendants' Cited Cases Are Distinguishable**

The cases Defendants cite in their footnotes for remittitur are materially distinguishable from Mrs. Lightner's case:

King v. McMillan, 594 F.3d 301 (4th Cir. 2010) involved a single incident of sexual harassment, not sixteen months of being forced to violate federal law. Robles v. Prince George's Cty., 302 F.3d 262 (4th Cir. 2002) concerned a one-time false arrest, not permanent psychiatric disability from prolonged workplace abuse. Cline v. Wal-Mart, 144 F.3d 294 (4th Cir. 1998) addressed temporary disability accommodation, not forced resignation after developing PTSD. Taylor v. North Carolina Dep't of Revenue, 2015 WL 4414844 (W.D.N.C. 2015) involved no medical evidence, while Mrs. Lightner presented contemporaneous medical certification of lifetime disability.

Unlike these cases, Mrs. Lightner presented: (1) contemporaneous medical documentation of permanent psychiatric injury; (2) expert testimony confirming PTSD and Major Depressive

Disorder; (3) evidence of sixteen months of forced legal violations; and (4) corroboration from seven managers who complained about Nathan. The Fourth Circuit in EEOC v. Sunbelt Rentals, 521 F.3d 306 (4th Cir. 2008), affirmed substantial emotional distress awards with far less medical evidence than presented here.

**E. The Award Reasonably Compensates Permanent Injury**

The $2,346,507.10 award reasonably compensates for:

- **Lifetime psychiatric treatment**: Bi-weekly therapy and monthly medical appointments for a "lifetime" condition over 30+ years (Trial Exhibit 6)

- **Economic losses**: Four years at $65,000 annually without double-counting [Trial Tr., vol. 3, p. 33-34]

- **Permanent psychiatric injury**: PTSD and Major Depressive Disorder that "consistently still continue" [Trial Tr., vol. 3, p. 14]

- **Career destruction**: Sixteen years building expertise destroyed, "believed to be blacklisted" [Trial Tr., vol. 3, p. 37]

Mrs. Lightner testified she didn't use approved FMLA during her notice period because: "[She] was doing that report up until hours of the night. It could have been 10 or 11 o'clock... I wanted to make sure the clients were still served" [Trial Tr., vol. 3, p. 109]. She worked through documented mental illness to secure $200,000 for Defendants: "if I hadn't completed the LISC report... They would have pulled it" [Trial Tr., vol. 2, p. 229]. Working through psychiatric symptoms to protect vulnerable residents demonstrates profound suffering warranting compensation.

Defendants' mitigation experts admitted they didn't account for Mrs. Lightner's mental health condition and based availability on markets where she didn't live, ignoring she was

homeless after Hurricane Beryl while suffering from PTSD. The jury reasonably rejected this flawed analysis.

The jury heard evidence, evaluated credibility, and awarded damages supported by substantial evidence of permanent injury. This Court should not substitute its judgment for the jury's careful evaluation. The verdict should stand.

## F. Defendants Waived Any Objection to Damages Testimony

Defendants now claim error in allowing testimony about attorney's fees and litigation costs, yet the trial transcript reveals they never objected to this testimony. When Mrs. Lightner testified about $500,000 in attorney's fees [Trial Tr., vol. 3, p. 36-37], Defendants sat silent. When she detailed $13,125.70 in deposition costs [Trial Tr., vol. 3, p. 39], no objection. The only damages-related objection came when Mrs. Lightner mentioned paying psychologist Dr. Harris-Britt, which the Court properly overruled as the payment was made [Trial Tr., vol. 3, p. 38].

Having failed to object at trial, Defendants cannot claim error now. Timms, 537 F. App'x at 267 ("a new trial will not be granted on grounds not called to the court's attention during the trial"). Their silence waived any challenge to this testimony. Moreover, presenting evidence of costs incurred does not mean the jury improperly included them in compensatory damages. The jury was instructed on compensatory damages for "pain, suffering, inconvenience, mental anguish, humiliation, reputation harm, or loss of enjoyment of life" [Jury Instructions], and nothing suggests they deviated from these instructions.

## CONCLUSION

For the foregoing reasons, Defendants' Rule 59(a) motion should be denied. The verdict reflects the jury's careful evaluation of overwhelming evidence, not manifest error or miscarriage of justice. After five days of testimony and review of contemporaneous medical documentation,

the jury rendered a sophisticated verdict that parsed claims discriminately- rejecting retaliation while finding hostile work environment and constructive discharge, awarding $1.00 against Nathan individually while holding corporate defendants accountable for sixteen months of deliberate indifference.

Defendants' motion reveals their strategy: manufacture procedural obstacles, delay proceedings, then claim prejudice from circumstances they created. They bifurcated to exclude evidence, delayed judgment entry 55 days preventing the punitive phase, raised juror misconduct 40 days late, and now seek reversal based on post-verdict sympathy. This Court should not reward such gamesmanship.

The evidence proved Monica Nathan forced Mrs. Lightner to violate federal law daily, told her to "seek counseling" when she complained [Trial Tr., vol. 2, p.160], creating conditions so intolerable that a sixteen-year exemplary employee developed permanent psychiatric disability (Exhibit 6). Corporate defendants knew for sixteen months yet chose institutional protection, with Pizarro admitting she refused to investigate 50 employees' complaints [Trial Tr., vol. 4, p.102]. The subsequent HCI investigation resulting in three terminations validates both Mrs. Lightner's complaints and the jury's verdict.

WHEREFORE, Plaintiff respectfully requests this Court deny Defendants' Rule 59(a) motion and enter judgment without further delay.

This the 20th day of October 2025.

**RICHBERG LAW, PLLC**

 _/s/ Shayla C. Richberg_____
Shayla C. Richberg
N.C. Bar #44743
3326 Durham-Chapel Hill Blvd B- 120A
Durham, NC 27707
Phone: 919.403.2444

25

## CERTITIFICATE OF COMPLIANCE

This brief complies with the page limit provided in L.R. 7.2 (f) and does not exceed 25 pages.

## <u>CERTIFICATE OF SERVICE</u>

   This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule 5.5.


Jeremy Stephenson, NC Bar No. 34623
Margaret Taviano, NC Bar No. 61506
LEWIS BRISBOIS BISGAARD & SMITH
521 East Morehead Street, Suite 250
Charlotte, North Carolina 28202 Phone:
(704) 557-9929
Fax: (704) 557-9932
Jeremy.Stephenson@LewisBrisbois.com
Margaret.Taviano@LewisBrisbois.com
*Attorneys for Defendants*


       **RICHBERG LAW, PLLC**

      _/s/ Shayla C. Richberg_____
      Shayla C. Richberg
      N.C. Bar #44743
      3326 Durham-Chapel Hill Blvd B- 120A
      Durham, NC 27707
      Phone: 919.403.2444
      Fax: 919.869.1440
      Email: DefendMe@RichbergLaw.com